JOSEPH T. MCNALLY
Acting United States Attorney
LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division
SCOTT PAETTY (Cal. Bar No. 274719)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6527
     Facsimile: (213) 894-6269
     E-mail:    scott.paetty@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                    UNITED STATES DISTRICT COURT

                FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>                    v.<br><br>CHRISTOPHER KAZUO KAMON,<br><br>            Defendant. | No. CR 23-47-JLS-2<br>      CR 23-24-JLS-1<br><br>GOVERNMENT'S SENTENCING POSITION;<br>DECLARATION OF SCOTT PAETTY;<br>SEALED EXHIBIT<br><br>Hearing Date: April 11, 2024<br>Location:     Courtroom of the<br>              Hon. Josephine L.<br>              Staton |

        Plaintiff United States of America, by and through its counsel

of record, the Acting United States Attorney for the Central District

of California and Assistant United States Attorney Scott Paetty,

hereby files its sentencing position for defendant Christopher Kamon

in the above referenced cases.

        This position is based upon the attached memorandum of points

and authorities, the presentence report, the testimony and exhibits

introduced during the 13-day trial of co-defendant Thomas Vincent

Girardi, the declaration of Scott Paetty and accompanying exhibit,

the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: March 28, 2025          Respectfully submitted,

JOSEPH T. MCNALLY
United States Attorney

LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division

            /s/
SCOTT PAETTY
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# **TABLE OF CONTENTS**

## Contents

TABLE OF CONTENTS.................................................i

MEMORANDUM OF POINTS AND AUTHORITIES.............................1

I.   INTRODUCTION...............................................1

II.  DEFENDANT'S OFFENSE CONDUCT AND CRIMINAL CONVICTIONS........2

         1.   Defendant's Background as Head of Accounting at
              Girardi Keese......................................2

     B.  The Main Fraud Scheme.................................4

         1.   Victim 1..........................................4

         2.   Victim 2..........................................5

         3.   Victim 3..........................................6

         4.   Victim 4 and 5....................................6

         5.   Victim V.A........................................6

     C.  The Side Fraud Scheme.................................7

III. RESPONSE TO THE PSR........................................8

     A.  Guidelines Calculations...............................8

     B.  The Government's Response to the PSR...................9

         1.   Defendant Should Receive a +20 Loss Enhancement
              Pursuant to the Plea Agreement....................9

         2.   Defendant Should Not Be Given a Two-Point
              Reduction for Zero-Point Offender.................10

     C.  Government's Response to Defendant's Objections to the
         PSR..................................................13

         1.   Defendant's Criminal Conduct Groups For
              Guidelines Purposes..............................13

         2.   Defendant's Challenge to the PSR's Loss
              Calculations Lack Merit..........................14

IV.  SECTION 3553(a) FACTORS...................................17

         1.   Nature and Circumstances of the Offense (18
              U.S.C. § 3553 (a)(1))............................18

i

2.    History and Characteristics of the Defendant (18
      U.S.C. § 3553 (a)(1))................................19

3.    Seriousness of the Offense, Respect for the Law,
      Just Punishment, and Deterrence (18 U.S.C. § 3553
      (a)(2)..............................................20

4.    The Kinds of Sentences Available, the Sentencing
      Range Established by the Sentencing Guidelines,
      and the Need to Provide Defendant Necessary
      Medical Care and Avoid Unwarranted Sentence
      Disparities (18 U.S.C. §§ 3553(a)(2), (3), (4),
      and (6))............................................21

V.   RESTITUTION AND FORFEITURE..................................22

VI.  CONCLUSION.................................................23

**TABLE OF AUTHORITIES**

**CASES**

Gall v. United States,
 552 U.S. 38 (2007)......................................17

Molina-Martinez v. United States,
 136 S. Ct. 1338 (2016).................................17

United States v. Callaway,
 762 F.3d 754 (8th Cir. 2014)...........................16

United States v. Carty,
 520 F.3d 984 (9th Cir. 2008)...........................17

United States v. Chung,
 No. 19-CR-00302-JSW-1, 2024
  WL 4609597, at *2 (N.D. Cal. Oct. 29, 2024)...........10

United States v. George,
 949 F.3d 1181 (9th Cir. 2020)..........................11

United States v. Pham,
 545 F.3d 712 (9th Cir. 2008) ..........................15

United States v. Rita,
 551 U.S. 338 (2007)....................................17

United States v. Stochel,
 901 F.3d 883 (7th Cir. 2018)...........................16

**STATUTES**

18 U.S.C. § 3553.........................................passim

**SENTENCING GUIDELINES**

U.S.S.G. § 2B1.1.................................11, 13, 15

U.S.S.G. § 3A1.1........................................11

U.S.S.G. § 3B1.1....................................11, 16

U.S.S.G. § 3D1.1........................................16

U.S.S.G. § 3E1.1........................................16

U.S.S.G. § 4C1.1........................................13

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3      Defendant Christopher Kazuo Kamon ("defendant" or "Kamon")

4  played an essential role in the long-running fraud scheme lead by co-

5  defendant Thomas Girardi ("Girardi").  As the head of accounting at

6  Girardi Keese for nearly two decades, defendant was the gatekeeper of

7  the firm's bank accounts and enabled Girardi's manipulation of those

8  accounts and lies to the firm's clients about their settlement funds.

9  Defendant facilitated Girardi's use of stolen client funds to pay

10  extravagant personal expenses and make Ponzi-like payments to other

11  clients and vendors in a doomed effort to keep Girardi Keese afloat

12  until the house of cards fell in late 2020.  Time and time again,

13  defendant looked the other way when Girardi instructed defendant to

14  steal client funds.  But Kamon did more than just aid and abet

15  Girardi in the theft of client funds from the firm's trust accounts.

16  Despite making hundreds of thousands of dollars in yearly salary,

17  defendant conceived, directed, and concealed a separate fraud scheme

18  that pilfered millions of dollars from the firm's operating accounts,

19  over which defendant had control.

20      Kamon's brazen side fraud, engineered to fund his own lavish

21  lifestyle evinces the same cynical, devious, and cavalier approach

22  exhibited by Girardi that ultimately destroyed Girardi Keese.

23  Defendant has pleaded guilty to two wire fraud counts related to

24  these schemes.  He also faces criminal charges in Chicago for similar

25  conduct in that jurisdiction.  Although there is no evidence that

26  defendant lied to Girardi Keese clients like co-defendant Girardi

27  did, defendant's criminal conduct was integral to the scheme and

28

caused irreparable damage to Girardi Keese clients and ultimately hastened the demise of Girardi Keese.  This conduct warrants a significant custodial sentence.

Therefore, consistent with the plea agreement in this case, for defendant's role as an aider and abettor to Tom Girardi in case number 23-47-JLS (the "main fraud scheme"), for his role in devising and carrying out the fraud scheme in case number 23-24-JLS (the "side fraud scheme"), and for the following reasons, the government submits that a sentence that includes 121 months imprisonment, a restitution order in the total amount of $8,903,324.26, three years of supervised release, and a special assessment of $200 is justified and appropriate.

## II.  DEFENDANT'S OFFENSE CONDUCT AND CRIMINAL CONVICTIONS

The following summary of defendant's offense conduct is based on facts stated in the presentence report ("PSR") ¶¶ 18-100.[1]

### 1.    Defendant's Background as Head of Accounting at Girardi Keese

Although defendant had no formal training in accounting, he was head of the accounting department at Girardi Keese from 2004 to December 2020 when the firm closed and was forced into bankruptcy. Kamon acted as defendant's right-hand man when it came to the management the firm's bank accounts, finances, and record keeping related to the firm's clients and the money that was owed them. Defendant had access to and awareness of all firm bank account

---

[1] Facts taken from sources other than the PSR are noted in separate parenthetical citations.  Defendant's criminal conduct in both the main fraud scheme and the side fraud scheme was also the subject of extensive testimony and other evidence during the 13-day trial of co-defendant Girardi.

2

balances, including its attorney-client trust accounts at Nano Bank and Torrey Pines Bank.  Defendant also had signatory authority and control over the Girardi Keese operating accounts.  Girardi dictated which clients would be paid, how much they would be paid and when, and Girardi signed all checks from the client trust accounts; however, these transactions required defendant's involvement to execute.  If Girardi had a question about account balances or payments due to clients or other vendors, Girardi went to defendant.

During Girardi's recent criminal trial a witness from the accounting department, N.R., testified that Girardi called defendant "my guy in accounting".  (Dkt. 377 at 26.[2])  Girardi would contact defendant each morning and asked for the balances of the firm's bank accounts, including the trust accounts.  When the firm's operating accounts were running low, defendant would inform Girardi, who would instruct defendant to take money from the firm's client trust accounts and send it to the operating accounts.  Girardi would identify what case to debit the funds from and tell defendant to code the transfer as "attorney's fees".  If defendant informed Girardi that fees had already been taken from the case, Girardi would tell defendant to "do it anyways".  Although defendant knew that the trust accounts should be used to promptly pay clients and draw the firm's fees and costs from those client settlement funds when appropriate, defendant knew that a common practice at Girardi Keese was for Girardi to tell defendant to transfer attorney's fees from a case in which fees had already been taken.  N.R. said that she never heard

---

[2] Pagination refers to the CM/ECF header.

1  defendant refuse to carry out an order regarding money transfers
2  given to him by Girardi.  (Dkt. 377 at 34.)

3  **B.  The Main Fraud Scheme**

4      Co-defendant Girardi was the architect and driver of the main
5  fraud scheme in which client settlement funds would be
6  misappropriated after Girardi made an assortment of
7  misrepresentations and/or material omissions to the clients, such as
8  misrepresenting and omitting the true value of the settlement, lying
9  about reasons for delaying payment, and then using the money for
10 other purposes.  These improper purposes included making Ponzi-like
11 payments to other Girardi Keese clients whose settlement funds had
12 already been stolen, paying the firm's payroll and other expenses,
13 and paying personal expenses for Girardi, other Girardi Keese
14 attorneys, and defendant.  Although Girardi led the main fraud
15 scheme, defendant played an integral and essential role.  The charged
16 conduct focused on the theft of settlement funds related to five
17 clients in four cases.[3]  These cases are discussed in detail in
18 paragraphs 28 to 51 of the presentence report and on pages 8-11 of
19 the government's sentencing position for co-defendant Girardi (Dkt.
20 419).  Relevant facts pertaining to defendant's involvement in the
21 four charged cases are discussed below.

22      **1.  Victim 1**

23      Victim 1 was badly burned in a gas explosion that killed his
24 girlfriend and destroyed his home.  After Girardi's initial lie to
25 Victim 1 and his family about the true value of their settlement
26 (Girardi told them the case settled for just over $7 million when the

27 _____

28      [3] An additional victim, V.A., was also identified as discussed
in PSR ¶¶ 52.

4

true value was $53 million), a wire for $28 million was sent to the Torrey Pines trust account.  Defendant received notice of that payment.  Instead of paying Victim 1 and his family the money they were due, those funds were used to pay other firm clients.  Defendant then aided and abetted Girardi in the fraud against Victim 1 by sending, at Girardi's direction, a series of lulling payments purportedly sourced from a separate interest bearing account that defendant well knew did not exist.  Nearly six years later, after years of efforts by Victim 1 and his family to get paid the money they were owed, defendant, at Girardi's direction, sent a $2.5 million check sourced from a different client's settlement funds to Victim 1.

       2.   <u>Victim 2</u>

Victim 2 was a widow whose husband died in a boating accident. Girardi Keese received a $504,400 settlement check for Victim 2's wrongful death claim.  At Girardi's direction, defendant transferred approximately $183,000 from the Torrey Pines trust account to a Girardi Keese operating account and coded it as "fees" when defendant knew that attorney's fees on Victim 2's case had already been taken out.  (<u>See</u> Trial Ex. 245, Victim 2 Case Card Register.)  Defendant then used those funds to pay the firm's payroll and wrote a $50,000 check to Girardi which was used to make payments to two exclusive golf country clubs.  Defendant further aided and abetted Girardi's efforts to defraud Victim 2 by sending a series of lulling payments to her comprised of funds sourced from other client settlements, not her own.

### 3.    Victim 3

Victim 3 retained Girardi Keese to represent her in a defective medical device claim.  After receiving Victim 3's $128,250 settlement into the Torrey Pines trust account, defendant aided and abetted Girardi in the theft of those funds by using those funds to pay for leases of luxury cars, instead of paying Victim 3.  Victim 3 to this day has never received any money from Girardi Keese.  (Dkt. 366 at 63.)

### 4.    Victim 4 and 5

Victims 4 and 5 retained Girardi Keese to represent them in a lawsuit related to a car accident that injured them and killed their minor son.  Prior to the initial $4 million payment on a $17.5 million settlement being received into the Nano Bank trust account, Girardi instructed defendant to take an improper "advance" on those funds and transfer them to the firm's operating account to pay firm expenses, even though defendant knew that those funds belonged to other clients.  At Girardi's direction, defendant later caused a $2.5 million check comprised in large part of Victims 4 and 5's settlement funds to be paid to Victim 1, whose settlement funds had already been stolen as described above.  In addition to these acts, defendant, again at Girardi's direction, sent a series of incremental lulling payments to Victims 4 and 5, which represented on a fraction of the total settlement due them.

### 5.    Victim V.A.

An additional victim, V.A., retained Girardi Keese to represent her in a claim related to her injuries in a car accident.  (See PSR ¶ 52.)  The case settled for approximately $6 million.  After attorney's fees and costs, V.A. was to be paid approximately $3

1  million.  After failing to pay V.A. the money owed to her, Girardi

2  and defendant caused a series of lulling payments that resulted in a

3  balance due to V.A. of approximately $1.2 million.

4      **C.    The Side Fraud Scheme**

5      As described above, defendant acted as a <u>de facto</u> apprentice to

6  Girardi's main fraud scheme for nearly a decade.  Additionally,

7  beginning at least as early as 2013 and continuing until Girardi

8  Keese closed in December 2020, defendant orchestrated a brazen theft-

9  within-a-theft, side fraud designed to steal money from Girardi

10  Keese.  (<u>See</u> PSR ¶¶ 53-59.)  Using his position as head of accounting

11  with privileged access to and control over the firm's operating

12  accounts, defendant embezzled funds from the firm's operating

13  accounts to enrich himself and others.  To carry out the scheme,

14  defendant recruited co-schemers such as I.B. and N.R. to pose as

15  purported vendors.[4]  At defendant's direction, I.B. submitted

16  numerous fake invoices to Girardi Keese, which defendant paid out of

17  the firm's operating accounts.  Defendant concealed these fake

18  invoices by referring to them as payment for work purported done by

19  I.B. for the benefit of Girardi Keese.  In truth, however, these

20  payments were for construction projects on defendant's personal

21  residences in Palos Verdes and Encino, California.  I.B. also paid

22  defendant cash kickbacks related to these payments that generally

23  amounted to approximately $10,000 each.

24      Defendant also paid N.R., a former girlfriend, $20,000 per month

25  out of the Girardi Keese operating account and attempted to conceal

26  those payments by calling the girlfriend a "legal marketer" when in

27  _____

28      [4] Both I.B. and N.R. testified at the trial of co-defendant
Girardi.  (<u>See</u> Dkt. Nos. 371 at 206-232, 372 at 13-29 & 120-158.)

1  fact she did no work for Girardi Keese at any time.  To conceal this

2  arrangement, defendant instructed N.R. to create register a shell

3  company N.M., Inc. and open a bank account for the business, into

4  which defendant could deposit the monthly checks.

5  **III. RESPONSE TO THE PSR**

6      **A.    Guidelines Calculations**

7      The United States Probation & Pretrial Services Office

8  ("Probation") calculated defendant's total offense level as 32 based

9  on the following factors:  base offense level of 7 under U.S.S.G.

10  § 2B1.1 (a)(1), plus an 22-level increase for a gain of more than

11  $25,000,000 but less than $65,000,000 pursuant to § 2B1.1 (b)(1)(L),

12  a two-level enhancement for substantial financial hardship under

13  § 2B1.1(b)(2)(A), a two-level enhancement for sophisticated means

14  under § 2B1.1(b)(10), a two-level enhancement for vulnerable victim

15  under § 3A1.1(b)(1), and a two-level enhancement for his role as a

16  leader/organizer of the side fraud scheme under § 3B1.1(b)(1).  These

17  calculations result in an adjusted offense level 37.  (PSR ¶¶ 106-

18  125.)  After adjustments for zero-point offender (-2) and acceptance

19  of responsibility (-3), defendant's total offense level was reduced

20  to 32.  (PSR ¶¶ 129-134.)

21      Based on a total offense level of 32 and a criminal history

22  category of I, Probation calculated defendant's guidelines range as

23  121 to 151 months.  (PSR ¶ 192.)  In its disclosed recommendation

24  letter, Probation recommended a custodial sentence of 121 months to

25  be followed by three years of supervised release, and a restitution

26  order in the amount of $2,310,247.26 in the main fraud scheme (23-CR-

27  47-JLS-2) and $6,593,077 in the side fraud scheme (23-CR-24-JLS).

28  (Dkt. 440.)

The government agrees with Probation's conclusion that the total offense level is 32 but reaches that level by slightly different calculations, as discussed below.  The government concurs in Probation's restitution calculations.

**B.   The Government's Response to the PSR**

The government recommends that defendant be given the benefit of the bargain in the plea agreement, which caps defendant's guidelines loss enhancement at +20 (for loss between $9.5 million and $25 million) and also recommends that defendant not be granted a zero-point offender reduction because his offense conduct caused substantial financial hardship to victims of the main fraud scheme and to Girardi Keese, the victim of the side fraud scheme.

1.   <u>Defendant Should Receive a +20 Loss Enhancement Pursuant to the Plea Agreement</u>

The parties agreed in the plea agreement to a loss range between +18 and +20.  (Dkt. 398 ¶ 13.)[5]  Defendant agreed that the loss is "at least $3.5 million and reserves the right to argue that [loss] is not higher than $9.5 million."  (<u>Id.</u>)  The government "reserves the right to argue that [loss] is over $9,500,000 but agrees that it is less than $25,000,000".  (<u>Id.</u>)  The government stands by the representations in the plea agreement and recommends based on the facts described <u>supra</u>, Section II, and the PSR ¶¶ 61-72 that the loss is not over $25 million for purposes of calculating the guidelines (Dkt. 398 ¶ 13).

---

[5] This amount did not include the additional loss related to Victim V.A. (PSR ¶ 73), which was confirmed after the charges in the above captioned cases were filed.

2.  Defendant Should Not Be Given a Two-Point Reduction for Zero-Point Offender

Defendant should not be entitled to relief under the zero-point offender section of the guidelines because his criminal conduct caused substantial financial hardship to victims of the main fraud scheme (e.g., Victims 4 and 5) and to the victim of the side fraud scheme (Girardi Keese).

A defendant with no criminal history points qualifies for a two-level decrease in his or her guidelines range provided, in relevant part, that defendant "did not personally cause substantial financial hardship."  U.S.S.G. § 4C1.1(a)(6).  In determining whether a defendant caused substantial financial hardship, courts look to Application Note 4(F) of the commentary to § 2B1.1 and the non-exhaustive factors listed therein.  Examples of such hardship are whether a victim had to make "substantial changes to living arrangements, such as relocating to a less expensive home", or was forced into bankruptcy.  U.S.S.G. § 2B1.1, comment. (n.4(F)(ii), (v); see also United States v. Chung, No. 19-CR-00302-JSW-1, 2024 WL 4609597, at *2 (N.D. Cal. Oct. 29, 2024) (citing U.S.S.G. § 2B1.1.)

Probation reasoned that defendant qualified for the reduction based on a finding that defendant did not have any communication with Victims 4 or 5 and was not necessarily aware of their particular claims.  (PSR ¶ 132.)  However, nothing in the guidelines requires such direct communication with a victim or knowledge of their individual claims as a predicate for finding that a defendant personally caused financial hardship.

In interpreting "substantial financial hardship", the Ninth Circuit has considered both "but for" and "proximate" causation.  See

10

United States v. George, 949 F.3d 1181, 1188 (9th Cir. 2020).  By either measure, defendant's personal actions caused the financial hardship inflicted on Girardi Keese clients (including Victims 4 and 5) and on Girardi Keese.  First, defendant clearly meets the "relatively undemanding" but-for standard because without defendant's involvement in managing the Girardi Keese accounting department during the main fraud scheme, including moving funds at Girardi's direction and withholding payments from clients at Girardi's direction, the main fraud would not have occurred or lasted as long as it did.  See George, 949 F.3d at 1187.  Moreover, there is no dispute that defendant was the mastermind of the side fraud and directed all aspects of its execution, which continued "through at least in or about December 2020" (Dkt. 398 at 24) until the firm collapsed into involuntary bankruptcy.

Defendant similarly satisfies a proximate cause inquiry in both the main fraud and side fraud because he (1) was aware that Girardi was impermissibly withholding and misappropriating client funds (Dkt. 398 at 21), (2) was personally involved in the scheme to misclassify stolen funds as "fees" drawn on other cases when it was improper to do so and acknowledged that this practice occurred "frequently" and that the pattern "got worse over time."[6] (PSR ¶ 93); (3) was aware that 6.5% "interest payments" to victim 1 were based on a lie that there was a $10 million annuity taken out for victim 1 (PSR ¶ 92 and

---

[6] Misappropriation of client funds occurred in the four charged cases in the main fraud scheme, in the Lion Air case, and in other cases as well.  (PSR 93; Trial Exs. 94 (Victim 1 case card register), 245 (Victim 2 case card register), 335 (Victim 3 case card register), and 458 (Victims 4 & 5 case card register), see also Dkt. 368 at 182-84 (discussing additional misappropriation of client funds) and Dkt. 377 at 60 (no 6.5% interest bearing account).

Dkt. 377 at 60); (4) knew that Girardi Keese clients (including Victims 4 and 5) were vulnerable because they were susceptible to Girardi's lies and "likely did not have knowledge of the legal system and were unfamiliar with legal settlement procedures" (PSR ¶ 119); (5) that "there was no reason for [Victim 4] to not be paid" (PSR ¶ 90); and (6) conceived of and implemented the side fraud scheme that siphoned millions of dollars from Girardi Keese at the same time that clients and vendors were not being paid and the firm was teetering on the edge of insolvency (Dkt. 398 at 24-25, PSR ¶ 84).

Thus, as in <u>George</u>, the potential for significant adverse consequences to victims (including Victims 4 and 5)[7] and the Girardi Keese law firm itself, as a result of defendant's involvement in both schemes were foreseeable to defendant. <u>See</u> <u>George</u>, 949 F.3d at 1188. The Court should decline to apply a -2 to defendant's guidelines under the zero-point offender provision because defendant's conduct caused substantial financial hardship to victims of both fraud schemes.

Therefore, the government's proposed guidelines calculation appears in the below table.

| Base Offense Level: | 7 | U.S.S.G. § 2B1.1(a)(1) |
|---|---|---|
| Specific Offense Characteristics: | | |
| Loss Between $9,500,000 and $25,000,000 | +20 | U.S.S.G. § § 2B1.1(b)(1)(K) |
| Substantial Financial Harm | +2 | U.S.S.G. § 2B1.1(b)(2)(A) |
| Sophisticated Means | +2 | U.S.S.G. § 2B1.1(b)(10) |

---

[7] Notably, in applying a +2 to defendant's guidelines for causing substantial financial hardship, Probation stated "due to Girardi <u>and [defendant's] conduct</u>", Victims 4 and 5 were "unable to purchase a home that they 'desperately need[ed]' and medical equipment for their paralyzed son", forcing them to stay in their current location.  (PSR ¶¶ 114-115) (emphasis added).

| | | |
|---|---|---|
| Vulnerable Victim | +2 | U.S.S.G. § 3A1.1(b)(1) |
| Leader/Organizer | +2 | U.S.S.G. § 3B1.1(c) |
| Acceptance of Responsibility | -3 | U.S.S.G. § 3E1.1(a),(b) |
| Total Offense Level | 32 | |

This total offense level of 32 is the same as the level recommended by Probation (albeit reached by different means) and results in the same advisory guidelines range, 121 to 151 months.  In sum, for the above reasons and the reasons discussed in section IV infra, the government concurs with Probation that defendant should be sentenced to 121 months custody, to be followed by three years supervised release, and a restitution order of $6,593,077 in case number 23-CR-24, and $2,310,247.26, in case number 23-CR-47-2-JLS. (Dkt. 400 at 1-2; PSR ¶¶ 203-204).

**C.  Government's Response to Defendant's Objections to the PSR**

1.  Defendant's Criminal Conduct Groups For Guidelines Purposes

Defendant objects to Probation's grouping of the counts to which defendant pleaded guilty in 23-24-JLS and 24-47-JLS, on grounds that the two offenses are separate and distinct.  (Dkt. 75 (in case number 23-24) at 4-6.)  The government disagrees and concurs with Probation that defendant's counts of conviction group.

First, the Guidelines allow grouping of counts contained in different charging documents.  (See PSR ¶ 103, citing U.S.S.G. § 3D1.1, comment. (n.1.).)  Second, the main fraud scheme and the side fraud scheme involve misappropriation of funds from the same Girardi Keese bank accounts that defendant oversaw and managed as the head of the firm's accounting department.  When the firm's operating

accounts were "low," defendant informed Girardi who, in turn,
instructed defendant to replenish the operating accounts with funds
from the firm's trust accounts.  (PSR ¶ 24.)  As the Court noted in
the denial of defendant's motion in limine to exclude evidence of the
side fraud scheme from Girardi's trial, "the two schemes alleged in
[the side fraud] case and the main case are closely aligned."  (Dkt.
235 at 5.)  Indeed, the main scheme "provided the funds used by both
Defendants, including funds that facilitated Defendant Kamon's
alleged side scheme."  (Id.)  Although the side fraud scheme involved
thefts from the Girardi Keese operating accounts while the main fraud
scheme focused on the firm's client-trust accounts, "this distinction
is near meaningless in the context of these cases, which allege
widespread fraud and non-compliance with accounting principles on a
fundamental level."  (Id. at 6.)  In sum, the "two Defendants are
alleged to have worked together in key executive positions at the
same law firm, they face the same charges, the charged conduct
relates to the misuse of funds in the bank accounts of the same law
firm, and the alleged side scheme has a complete temporal overlap
with the alleged main scheme."  (Id. at 7.)  Grouping is warranted
here.[8]

      2.    Defendant's Challenge to the PSR's Loss Calculations
          Lack Merit

    Defendant also challenges Probation's loss calculation in the
PSR.  (Dkt. 75 at 7-8.)  Defendant's arguments against the PSR's loss
findings are that they do not credit him for lulling payments and
result in double counting.  Both arguments lack merit.

---

[8] Defendant also raises a "double counting" argument that is
addressed in the next section.

14

First, as discussed in the previous section, defendant's counts of conviction are properly grouped.  Moreover, although the operating accounts were replenished with funds from the client trust accounts, the trust accounts also contained millions of dollars in commingled funds from a variety of sources including Girardi's personal funds, funds from the liquidation of Girardi real property, and loans from litigation lenders.  (PSR ¶¶ 82, 87.)  There is no double counting because Girardi Keese was entitled to more than the $6 million that defendant stole from the operating accounts in the side fraud scheme based on the attorney's fees and costs that were due to the firm from the four charged defendants in this case alone.  (See PSR ¶¶ 62 (Girardi Keese entitled to approximately $15.75 million from Victim 1), 65 ($170,000 from Victim 2), 68 ($37,000 from Victim 3), 70 ($5.95 million from Victims 4 & 5).)

Furthermore, the harm to Girardi Keese from the side fraud is separate and distinct from the harm suffered by the firm's clients due to the main fraud.  See United States v. Pham, 545 F.3d 712, 717 (9th Cir. 2008) (where victims suffer "distinct wrongs" as a result of a defendant's criminal conduct "and if accounting for those distinct wrongs is necessary to make the defendant's sentence reflect the full extent of the wrongfulness of his conduct, then we hold that it is not impermissible double counting to consider both groups as victims even if their losses are ultimately traceable to the same fraudulently obtained funds.") (cleaned up).  Here, in light of the serious consequences suffered by the two sets of victims and the need for defendant's sentence to reflect the full extent of his wrongful

conduct, it is not double counting, even if some illegal proceeds of the side fraud overlap with stolen client money from the main fraud.[9]

Second, although lulling payments were made to victim-clients, they were sourced from other funds, not their actual settlements, and so they should not be credited against loss for guidelines purposes. (PSR ¶ 74 n.2.)[10]  That lulling payments were made after defendant had stolen the victims' settlement funds and came after the victims made repeated efforts and requests to be paid[11] militates against such credit because such payments serve no other purpose but to prolong the fraud scheme and avoid detection, as is the case with all Ponzi schemes.  A defendant is not entitled to a credit when the defendant's objective in repaying a victim is to perpetuate ongoing fraud.  See, e.g., United States v. Callaway, 762 F.3d 754, 759-60 (8th Cir. 2014) (payments to victim were "necessary to give [defendant's] scheme a veneer of legitimacy"); see also United States v. Stochel, 901 F.3d 883, 890-91 (7th Cir. 2018) (defendant not entitled to offset where he paid some funds towards genuine receivership expenses because they were made to conceal and "were essentially the cost of perpetuating the scheme").  Therefore, there is no basis to reduce defendant's loss by the amount of lulling payments.

Finally, as discussed above, defendant should be given the benefit of his bargain related to loss in his plea agreement and,

---

[9] The government does not concede that there is any overlap in stolen funds.

[10] These lulling payments may be (and have been) counted toward defendant's restitution obligation.

[11] See Dkt. Nos. 364 at 153 (Victim 1), 364 at 240 (Victim 2), 366 at 56 (Victim 3), and 368 at 70-71 (Victim 4).

16

1  thus, the government respectfully requests that defendant's loss

2  amount for guidelines purposes should be limited to below

3  $25,000,000.  (Dkt. 398 ¶ 13.)

4  **IV.  SECTION 3553(a) FACTORS**

5      The Court should impose a sentence sufficient, but not greater

6  than necessary, to reflect the purposes of sentencing identified in

7  18 U.S.C. § 3553(a).  United States v. Carty, 520 F.3d 984, 991 (9th

8  Cir. 2008).  The advisory Guidelines range provides the "starting

9  point and . . . initial benchmark" for this Court's consideration of

10  an appropriate sentence.  Molina-Martinez v. United States, 136 S.

11  Ct. 1338, 1345 (2016) (quoting Gall v. United States, 552 U.S. 38, 49

12  (2007).  Although the Guidelines are not binding, they "reflect a

13  rough approximation of sentences that might achieve section 3553(a)'s

14  objectives."  United States v. Rita, 551 U.S. 338, 350 (2007).

15      Under 18 U.S.C. § 3553(a), in arriving at the appropriate

16  sentence, the Court should consider, among other factors, the nature

17  and circumstances of the offense and the history and characteristics

18  of the defendant, § 3553(a)(1); the need for the sentence imposed to

19  reflect the seriousness of the offense, to promote respect for the

20  law, and to provide just punishment for the offense, § 3553

21  (a)(2)(A); the need for the sentence imposed to afford adequate

22  deterrence to criminal conduct, § 3553(a)(2)(B); the need for the

23  sentence imposed to protect the public from further crimes of the

24  defendant, § 3553(a)(2)(C); the kinds of sentences available,

25  § 3553(a)(3); and the need to avoid unwarranted sentence disparities,

26  § 3553(a)(6).

27

28

1    In light of the relevant § 3553(a) factors, a 121-month

2  custodial sentence is sufficient, but not greater than necessary, to

3  achieve the goals of sentencing here.

4        1.    Nature and Circumstances of the Offense (18 U.S.C. §

5              3553 (a)(1))

6    Defendant's participation in two fraud schemes that resulted in

7  tens of millions of dollars of losses to victims is serious conduct

8  that warrants a significant custodial sentence.  Defendant's

9  complicity in the main fraud scheme enabled Girardi to perpetrate and

10 conceal the fraud for years.  Without defendant in his accounting

11 department, Girardi would not have been able to carry on the Ponzi-

12 like shuffle of new client money to pay old clients for nearly as

13 long.  Indeed, defendant played the part of Girardi's "guy in

14 accounting" to the fullest.  He did not raise questions and he did

15 not object when Girardi told him to break the rules governing client

16 trust accounts by taking out more fees than were due.  When Girardi

17 said "do it anyways", defendant did just that despite knowing that

18 the trust account should be used to pay clients and draw only the

19 appropriate fees and costs for the firm.  (PSR ¶¶ 24, 87.)

20 Defendant's willingness to follow Girardi's directions and withhold

21 payments from clients in order to transfer money to the firm's

22 operating accounts (PSR ¶ 93), and even make payments directly out of

23 the trust accounts to pay personal expenses like jewelry or purses

24 for Girardi's wife (PSR ¶ 89) evinces utter disregard for the welfare

25 of the firm's clients and a desire to put Girardi's interests, and by

26 extension his own interests, first.  The devastating impact that the

27 main fraud had on Girardi Keese victim-clients is apparent from the

28 impact statements included with the government's sentencing position

for co-defendant Girardi.  (See Dkt. 428, Ex. 1.)  To be fair, the fact that defendant was taking orders from Girardi, his boss and a powerful attorney, in carrying out the main fraud is mitigating. Moreover, there is no evidence that defendant ever directly lied to clients, like Girardi did.  And defendant ultimately accepted responsibility for his crimes and pleaded guilty.

But defendant's cynical side fraud, although perhaps not unexpected (indeed defendant learned how to lie and manipulate from the master thief——Girardi), compounds the seriousness of his criminal conduct.  Defendant pilfered the Girardi Keese operating accounts at the same time the firm was having financial difficulties and defrauded clients were clamoring to be paid settlement funds that, in some instances, had been due to them for years.  Defendant's side fraud was motivated by greed, plain and simple, and the desire to make extravagant expenditures for his personal benefit, including luxury cars, renovations on two residences, private air travel, gambling, and payments to his girlfriend.

In sum, defendant's complicity in the main fraud and willingness to engage in a fraud-within-a-fraud compounds his culpability and warrants a meaningful custodial sentence.

> 2.    History and Characteristics of the Defendant (18 U.S.C. § 3553 (a)(1))

Defendant's history and characteristics evince an upbringing where defendant had many advantages.  He had a "typical" and "normal" childhood with close family connections and support.  (PSR ¶ 151.) Defendant was a good student for whom "school was easy" and, although his family encountered financial struggles, defendant had the potential to channel his aptitude for math into a meaningful life.

But he chose another path.  Defendant's reference to his promotion to head of accounting at Girardi Keese as a "turning point" carries with it a bitter irony in that it coincides with his descent into criminal activity.  Defendant's health issues and family turmoil provide mitigating context (PSR 152-155) but ultimately are no excuse for his criminal conduct.

In addition to his convictions in this case, defendant is charged separately (along with Girardi and another senior Girardi Keese attorney) with wire fraud in the Northern District of Illinois for aiding and abetting the similar misappropriation of client settlement funds related to the Lion Air crash.  (See United States v. Girardi et al., case number 23-CR-54, N.D. Ill.)  That case is still pending.

Defendant's acceptance of responsibility in this case is a significant mitigating circumstance; however, despite agreeing to a money judgement of forfeiture in the amount of $3.1 million, defendant has to date opposed the Girardi Keese bankruptcy trustee's efforts to forfeit a $2.4 million luxury residence in the Bahamas and similarly refused to assist in the recovery of funds held in a Bahamian bank account to satisfy that obligation.  (See Exhibit 1 to the Paetty Declaration attached hereto; see also Dkt Nos. 2277, 2309, and 2338, In re Girardi Keese, 20-bk-21022-BR (C.D. Cal.).)  Defendant's efforts to impede liquidation of his assets to satisfy his pending restitution obligation are concerning and amplify the risk of recidivism.

3.   Seriousness of the Offense, Respect for the Law, Just Punishment, and Deterrence (18 U.S.C. § 3553 (a)(2)

The seriousness of defendant's criminal conduct, the need for

general deterrence, to promote respect for the law, and to provide just punishment further justify a guidelines sentence of 121 months. Defendant aided and abetted Girardi for many years and then doubled down on that crime by concocting the side fraud scheme, which was motivated solely by defendant's greed and desire to live an extravagant lifestyle.  These callous actions underscore the seriousness of defendant's offenses.

A significant sentence is also warranted here to deter individuals who oversee client-trust accounts, which are by nature (and name), the most sacrosanct bank accounts in the legal industry. Individuals, like defendant, who handle these accounts should be made aware that fraudulent conduct related to these accounts and sensitive financial information associated with them will have serious consequences.  Defendant's unwillingness to assist in the forfeiture proceedings, as discussed in the previous section, also raises the question of whether defendant is a risk for recidivism.

In sum, a sentence of 121 months is necessary to reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence, and provide just punishment for defendant's crimes.

4.    The Kinds of Sentences Available, the Sentencing Range Established by the Sentencing Guidelines, and the Need to Provide Defendant Necessary Medical Care and Avoid Unwarranted Sentence Disparities (18 U.S.C. § 3553 (a)(2), (3), (4), and (6))

The government's recommended sentence is within the guidelines range for defendant's criminal conduct.  Moreover, it is commensurate with the government's recommended sentence (168 months) for defendant

21

Girardi.  Defendant's involvement in the side fraud is certainly an aggravating circumstance; however, there is no evidence that defendant engaged in the elaborate and devious lies that Girardi told his clients to further the main fraud.  And, although not an excuse, the main fraud scheme provides the framework that made the side fraud possible.  Put another way, Girardi's cunning and cavalier theft of funds from the trust accounts made criminality commonplace at Girardi Keese by normalizing aberrant and abhorrent behavior.  In doing so, Girardi cultivated an environment that fostered defendant's side fraud.  To be clear, that is not a mitigating fact, but it provides context for the relative culpability of Girardi and defendant and supports the government's 121-month recommendation here.  Moreover, defendant pleaded guilty and should be afforded the benefit of his acceptance of responsibility and the agreed upon low-end guidelines sentence in his plea agreement.  The recommended sentence here will not result in unwarranted sentencing disparities when compared to the government's recommendation for co-defendant Girardi.

## V.   RESTITUTION AND FORFEITURE

Under the Mandatory Victims Restitution Act, restitution is mandatory in this case.  (PSR ¶ 203.)  The government agrees with the restitution amounts and schedule found by Probation.  (See PSR ¶¶ 109, 203-204.)  Specifically, restitution in the amount of $8,903,324.26 should be ordered, to be paid as described in the PSR.  (PSR ¶¶ 203-204.)  The United States will seek forfeiture, as alleged in the indictment, and to that end the Court has ordered a money judgment of forfeiture against defendant in the amount of $3,100,000 (Dkt. 453.)

## VI.   CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to 121 months imprisonment, a restitution order in the total amount of $8,903,324.26 (divided between the two cases in which he pleaded guilty), three years of supervised release, and a special assessment of $200.

Dated: March 28, 2025                    Respectfully submitted,

                                         JOSEPH T. MCNALLY
                                         Acting United States Attorney

                                         LINDSEY GREER DOTSON
                                         Assistant United States Attorney
                                         Chief, Criminal Division


                                         _____/s/_____
                                         SCOTT PAETTY
                                         Assistant United States Attorney

                                         Attorneys for Plaintiff
                                         UNITED STATES OF AMERICA

23

The undersigned, counsel of record for the government, certifies that this brief contains 5,900 words, which complies with the word limit of L.R. 11-6.1.

Dated: March 28, 2025                    Respectfully submitted,

                                         JOSEPH T. MCNALLY
                                         Acting United States Attorney

                                         LINDSEY GREER DOTSON
                                         Assistant United States Attorney
                                         Chief, Criminal Division


                                         _____/s/_____
                                         SCOTT PAETTY
                                         Assistant United States Attorneys

                                         Attorneys for Plaintiff
                                         UNITED STATES OF AMERICA

1

1

### <u>DECLARATION OF SCOTT PAETTY</u>

2    I, Scott Paetty, being duly sworn, declare and state as follows:

3        1.    I am an Assistant United States Attorney with the United

4    States Attorney's Office for the Central District of California.  I

5    am the attorney assigned to the following cases:  <u>United States v.</u>

6    <u>Girardi et al.</u>, No. CR 23-47-JLS and <u>United States v. Kamon</u>, CR 23-

7    24-JLS.

8        2.    Exhibit 1 is a true and correct copy of a letter from

9    Elissa Miller, the Chapter 7 Bankruptcy Trustee of the Girardi Keese

10   law firm.  This letter is provided to the Court pursuant to the

11   government's obligations under the Crime Victims Rights Act.  It has

12   been produced to defendant and Probation

13       I declare under penalty of perjury under the laws of the United

14   States of America that the foregoing is true and correct to the best

15   of my knowledge and that this declaration is executed at Los Angeles,

16   California, on March 28, 2025.

17

18

19   _____

20   SCOTT PAETTY

21

22

23

24

25

26

27

28

1